**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| KETTERING ADVENTIST HEALTHCARE, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:21-cv-136 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| JADE DESIGNS, LLC, D/B/A FULLY PROMOTED, *et al*. | : | |
| | : | |
| | : | |
| Defendants, | : | |

**ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART,
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 35) AND
GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (DOC. NO. 36)**

Kettering Adventist Healthcare ("Plaintiff") brought the instant Complaint (Doc. No. 1) (the "Complaint") against Jade Design, LLC, d/b/a Fully Promoted ("Fully Promoted") and Jennifer Snyder ("Snyder") (collectively, "Defendants"), alleging several causes of action, relating to Plaintiff's attempts to purchase suitable masks from Defendants for use in its hospitals. Presently before the Court are Plaintiff's Motion for Summary Judgment (Doc. No. 35) and Defendants' Motion for Judgment (Doc. No. 36).

For the reasons discussed below, the Court **GRANTS, IN PART, AND DENIES, IN PART**, Plaintiff's Motion for Summary Judgment and **GRANTS, IN PART, AND DENIES, IN PART**, Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

The events giving rise to this matter take place during the height of the initial waves of the COVID-19 pandemic from mid-2020 to early 2021.  Plaintiff is a healthcare system headquartered

1

in Dayton, Ohio that operates hospitals and physician practices throughout the area. (Doc. No. 35-1 at PageID 337.) Like many healthcare systems throughout the area, Plaintiff needed personal protective equipment ("PPE") for use in its various hospitals. (*Id*.)

Fully Promoted typically sells branded apparel and promotional equipment, such as water bottles and pens. (Doc. No. 35-2 at PageID 348-49.) Snyder owns 50% of Fully Promoted and works for the business full-time. (*Id*. at PageID 347.) However, in March 2020, Snyder decided to foray into the world of mask procurement in response to the need for masks among medical personnel. (*Id*. at PageID 351.)

In an effort to secure PPE for Plaintiff, Trisha Gillum, the Executive Director of Supply Chain and Materials Distribution for Plaintiff, reached out to Defendants. (Doc. No. 35-1 at PageID 337.) In March of 2020, Plaintiff placed an order with Defendants for 30,000 N95 masks. (*Id*. at PageID 338.) Plaintiff later increased the quantity of masks it needed to 330,000 N95 masks. (Doc. No. 35-2 at PageID 407.) Snyder understood Plaintiff's main request to be for 3M-made N95 masks. (*Id*. at PageID 359.) Ultimately, Defendants were unable to fulfill the order, and Plaintiff received a refund of the amount it had paid to Defendants. (*Id*. at PageID 425-27.) On August 26, 2020, while arranging the refund of Plaintiff's March 2020 payment, Snyder emailed Gillum, "[o]ur corporate office has been able to acquire the 3M 1860's so if the need arises again in the future please let me know." (*Id*. at PageID 426.)

A few months later, in December 2020, Plaintiff again reached out to Defendants as a result of the resurgence in the COVID-19 pandemic. (Doc. No. 35-1 at PageID 338.) Plaintiff agreed to purchase 300,000 3M-made N95 masks for $1,180,000. (*Id*.; Doc. No. 35-2 at PageID 366-68.) On December 10, 2020, Defendants emailed Plaintiff an order confirmation reflecting an order of 300,000 "3M 1860 N95 Particulate Respirator/Surgical Masks," for a price of $1,185,000. (Doc.

No. 35-2 at PageID 379; 36-1 at PageID 497.) On December 22, 2020, Plaintiff issued a "Purchase Order Modified" form to Defendants for 300,000 "Mask N95 3M" for a cost of $1,185,000 to be delivered on December 27, 2020. (Doc. Nos. 35-2 at PageID 381-83; 36-2.) Plaintiff subsequently wired the funds for the masks. (Doc. No. 35-1 at PageID 338.)

On January 13, 2021, Plaintiff contacted Defendants, informing them that Plaintiff had "facilities reaching out with concern[s] that the 3M mask[s] we have are counterfeit" and requesting verification that the masks were not counterfeit. (Doc. No. 35-2 at PageID 429.) In response, Snyder reached out to Mike DeMeo ("DeMeo"), a fellow franchisee whom Snyder worked with to obtain the masks. (Doc. No. 35-2 at PageID 370, 433-77.)

Around January 14, 2021, Plaintiff took the step of submitting information about the masks to 3M's COVID-19 Fraud Response Team. (Doc. Nos. 33 at PageID 296; 33-3 at PageID 309-11; 35-1 at PageID 338.) As part of this process, Plaintiff submitted, and 3M reviewed, pictures of the masks, the boxes the masks arrived in, and the documents accompanying the shipment. (Doc. Nos. 33 at PageID 296; 33-2.) The masks were reviewed by 3M's COVID-19 Fraud Response Team, which is overseen by Cassie Jacobson ("Jacobson"), the Director of the Fraud Hotline and Application Engineering at 3M. (Doc. No. 33 at PageID 295-96.) After completing a review of the masks, 3M concluded the masks were counterfeit products and advised Plaintiff not to use them. (Doc. No. 33 at PageID 296.)

On February 8, 2021, Plaintiff demanded a full refund of the $1,185,000 paid to Defendants for the masks and an additional $18,064 that Plaintiff expected to incur in fit testing employees with new masks. (Doc. No. 46-1 at PageID 921-22.)

Plaintiff filed its Complaint on May 3, 2021. (Doc. No. 1.) The Complaint alleges six counts: breach of contract, fraud and fraud in the inducement, negligent misrepresentation,

conversion, replevin, and unjust enrichment. (*Id*. at PageID 13-19.) On March 1, 2023, the Parties filed their respective motions. (Doc. Nos. 35, 36.) On March 22, 2023, the Parties filed their respective responses (Doc. Nos. 40, 41), and on April 21, 2023 both Parties filed their replies (Doc. Nos. 44, 45.) Plaintiff was granted leave to file a sur-reply on June 12, 2023 (Doc. No. 52) and Plaintiff filed its sur-reply on June 12, 2023 (Doc. No. 53). The motions are fully briefed and ripe for decision.

## II.     <u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c). The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id*. at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

4

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

As judgment is sought on claims brought under Ohio law, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co.v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "in accordance with the then-controlling decision of the highest court of the State." *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001). To the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* This is done by looking to other available data, which "include decisions of the

state appellate courts, and those decisions should not be disregarded unless" presented with persuasive data that the Supreme Court of Ohio would decide otherwise; instead, such decisions should be given weighty, but not controlling, deference.  *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001); *see also Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 5 (6th Cir. 2021).

### III.    ANALYSIS

Plaintiff and Defendants filed dueling motions for summary judgment that address all six counts of Plaintiff's Complaint.  The Court will consider the briefing together and address each count in turn.

### A.  Breach of Contract and the Perfect Tender Rule

The first count in Plaintiff's Complaint is for breach of contract.  (Doc. No. 1 at PageID 13-14.)  Plaintiff argues that the contract for the sale of the masks is covered by Ohio's adoption of the Uniform Commercial Code ("UCC").  (Doc. No. 35 at PageID 321-22.)  Plaintiff further argues that Defendants violated the contract because the masks they delivered did not conform to the agreement, namely, they were not 3M-made N95 masks.  (*Id.* at PageID 321-25.)  In response, Defendants argue that Plaintiff has not offered any evidence that it revoked its acceptance of the masks.  (Doc. No. 41 at PageID 791-92.)  Defendants further argue that it substantially complied with the contract because Plaintiff ordered 300,000 masks and they delivered 300,000 masks. (Doc. No. 36 at PageID 489-92.)

Under Ohio law, the elements of breach of contract are: "(1) the existence of a binding contract or agreement; (2) the non-breaching party's performance of its contractual obligations; (3) the other party's failure to fulfill its contractual obligations without legal excuse; and (4) the non-breaching party suffered damages as a result of that failure."  *List Indus., Inc. v. Umina*, No.

6

3:18-cv-199, 2021 U.S. Dist. LEXIS 128716, at *39, 2021 WL 2916967, at *14 (S.D. Ohio July 12, 2021) (citing *Lawrence v. Lorain Cnty. Cmty. Coll.*, 127 Ohio App. 3d 546, 548-49, 713 N.E.2d 478, 480 (Ohio Ct. App. 1998)).

Ohio has adopted the UCC, which governs the sale of goods, as part of its revised code. *Dayton Area School E.F.C.U. v. Nath*, No. 16956, 1998 Ohio App. LEXIS 4141, at *10, 1998 WL 906397, at *4 (Ohio Ct. App. Sept. 4, 1998).  A "good," as defined by the Ohio Revised Code, "means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action."  Ohio Rev. Code § 1302.01(A)(8).

As an initial matter, the Court finds that a binding agreement existed between the Parties, as encapsulated in the Purchase Order Modified form.  (Doc. Nos. 35-2 at PageID 381-83; 36-2.)  Indeed, neither party disputes the existence of a contract.  The Court finds that the contract was for 300,000 "Mask N95 3M" for a cost of $1,185,000.  The Court further finds Plaintiff performed its part of the contract by wiring the purchase amount of $1,185,000.  The Court also finds that this contract is governed by the UCC because a mask is a "good" as defined by Ohio Rev. Code § 1302.01(A)(8).  Thus, the Court will turn to the questions of whether Defendants breached the contract and whether they did so without excuse.

### i.  Delivery of Non-conforming Goods

Plaintiff argues that, under the UCC, when a good fails to conform in any respect to the contract, the seller is liable for breach of contract.  (Doc. Nos. 35 at PageID 322; 40 at PageID 756.)  The December 10, 2020 Order Confirmation lists the "Product" as "3M 1860 N95 Particulate Respirator/Surgical Mask."  (Doc. No. 35-2 at PageID 379.)  Moreover, the December 22, 2020 "Purchase Order Modified" form lists the "item" as "MASK N95 3M."  (Doc. Nos. 35-2

at PageID 382; 36-2.) The "Purchase Order Modified" form also lists the delivery date as December 27, 2020. (*Id*.)

After submitting the masks delivered by Defendants for review by 3M's COVID-19 Fraud Response Team in January 2021, 3M concluded that it did not produce or sell the masks delivered by Defendants. (Doc. No. 33 at PageID 296.) Specifically, Jacobsen stated that "the Mask packaging did not conform to authentic 3M packaging, and the construction of the Masks did not conform to the known characteristics of authentic 3M respirators." (*Id*.)

Under Ohio Rev. Code § 1302.60(A):

[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:
(A) reject the whole; or
(B) accept the whole; or
(C) accept any commercial unit or units and reject the rest.

In this case, Plaintiff specifically ordered 3M N95 masks. Both the Order Confirmation sent by Defendants and the Purchase Order Modified sent by Plaintiff reflects that the masks were to be 3M-made N95 masks.

Defendants argue that the declaration of 3M's employee, Jacobsen, does not conclusively resolve the issue of whether the masks were 3M masks or not because a reasonable jury may conclude that the investigation was cursory or incomplete. (Doc. No. 41 at PageID 793-95.) "[I]t is well-established in our case law that a party may not avoid summary judgment by resorting to 'speculation, conjecture, or fantasy.'" *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). In this case, Defendants point to no evidence that the masks were indeed produced by 3M. Defendants' argument does nothing more than speculate that the jury may not accept Jacobsen's evaluation that the masks were not 3M masks. This is insufficient to create an issue of fact.

Moreover, the Court finds that there is no genuine issue of material fact as to whether the masks were produced by 3M. The only evidence before the Court comes from 3M and definitively states that the masks were counterfeit. Therefore, Defendants delivered non-conforming goods in breach of the contract.

## ii. **Revocation of Acceptance**

Defendants argue that Plaintiff has offered no evidence that it rejected or revoked acceptance of the shipment. (Doc. No. 41 at PageID 791-92.) Plaintiff argues that it properly revoked acceptance when, on February 8, 2021, it sent Defendants a letter demanding a refund. (Doc. No. 45 at PageID 907.)

Under Ohio Rev. Code § 1302.66:

> (A) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:
>> (1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
>> (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
> (B) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
> (C) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Upon receiving 3M's evaluation that the masks provided by Defendants were not 3M masks, on February 8, 2021, Plaintiff demanded a refund of the $1,185,000 purchase price and $18,064 in fit testing that would need to be done in order to test new masks. (Doc. No. 46-1 at PageID 922.) Plaintiff further stated, "[s]hould Fully Promoted/you wish the return of the counterfeit respirators sold to KHN, please advise and they will be returned at your expense." (*Id.*)

The evidence presented demonstrates that Plaintiff first had concerns the masks were counterfeits around January 13, 2021. (Doc. No. 35-2 at PageID 429.) Plaintiff then submitted the masks delivered by Defendants to 3M around January 13, 2021. (Doc. No. 33-2 at PageID 308.) 3M informed Plaintiff that the masks were counterfeits on January 27, 2021. (Doc. No. 33-3 at PageID 309.) Plaintiff then sent its letter demanding a refund to Defendants on February 8, 2021, less than two weeks later. (Doc. No. 46-1.)

From the time Plaintiff's employees first began expressing concerns that the masks were counterfeit to the time Plaintiff demanded a refund from Defendants was less than one month. Indeed, the time from when Plaintiff confirmed the masks were counterfeit to the time Plaintiff sent its demand letter to Defendants was less than two weeks. Defendants contend that no evidence has been presented that Plaintiff revoked its acceptance and, consequently, they do not argue that the amount of time between delivery and the February 8 letter was unreasonable. Therefore, the Court finds that the less-than-six-week period between the delivery of the masks and the revocation of acceptance via the February 8, 2021 letter was reasonable. *Am. Geothermal Corp. v. Kern*, No. WD-85-106, 1986 Ohio App. LEXIS 8859, at *15, 1986 WL 12237, at *6 (Ohio Ct. App. Oct. 31, 1986) ("In this case, the record reveals that the fifteen months which transpired between the delivery of the goods and the subsequent letter indicating that the goods were substantially impaired in value and did not comply with the terms of the sales agreement was reasonable"); *Aluminum Line Prods. Co. v. Rolls-Royce Motors, Inc.*, 98 Ohio App.3d 759, 769, 649 N.E.2d 887, 895 (Ohio Ct. App. Nov. 21, 1994) (holding that three years was not an unreasonable time period because the vehicle had been used well below the recognized standard over that time); *Reese v. Boardman Cycle Ctr.*, NO. 94 C.A. 230, 1997 Ohio App. LEXIS 1631, at *6, 1997 WL 197991,

at *2 (Ohio Ct. App. Apr. 14, 1997) (holding that the one-month period between date of purchase and date of return was not unreasonable).

Defendants further argue that Plaintiff's retention of the masks demonstrates that it did not effectively revoke acceptance. (Doc. No. 44 at PageID 882-84.) Plaintiff argues that it was entitled to retain the masks until it received a refund. (Doc. No. 45 at PageID 903.) Under Ohio Rev. Code § 1302.85(C):

> On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care, and custody and may hold such goods and resell them in like manner as an aggrieved seller as provided in section 1302.80 of the Revised Code.

Indeed, the evidence demonstrates that Plaintiff intended to retain the masks only until Defendants refunded the amount for the masks and the additional cost of fit testing new masks. (Doc. No. 46-1.) Thus, the fact that Plaintiff retained the masks does not demonstrate that it had not revoked its acceptance of the masks. *See Aluminum Line*, 98 Ohio App.3d 759, 765, 649 N.E.2d 887, 89-92 (finding that the buyer's continued retention and use of the goods was permissible under Ohio Rev. Code § 1302.85(C)); *Furlong v. Alpha Chi Omega Sorority*, 73 Ohio Misc.2d 26, 37, 657 N.E.2d 866, 873 (Ohio Mun. Ct. 1993) (finding Defendant still had rightful possession of the goods as a security interest for the partial payment made on the purchase price).

### iii. <u>Right to Cure</u>

Defendants argue that Plaintiff did not respond to their offer to cure the non-conforming mask delivery. (Doc. No. 44 at PageID 883-84.) In support of this argument, Defendant attached a March 19, 2021 letter from its counsel to Plaintiff. (Doc. No. 44-1.) In its sur-reply, Plaintiff argues that Defendants did not properly put evidence supporting its cure argument before the Court because the exhibit cited by Defendants is unauthenticated and hearsay. (Doc. No. 53 at PageID

990-91.)  Plaintiff further argues that Defendants did not have the right to cure under Ohio Rev. Code § 1302.52.  (*Id*. at PageID 991-93.)

> Ohio Rev. Code § 1302.52 states:
>
> (A) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.
> (B) Where the buyer rejects a non-conforming tender which the seller had reasonable ground to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer, have a further reasonable time to substitute a conforming tender.

Where a buyer fails to give a seller reasonable time to cure the non-conforming tender, the buyer's revocation is ineffective.  *Ferjutz v. Habitat Wallpaper & Blinds*, No. 69495, 1996 Ohio App. LEXIS 2868, at *14-15, 1996 WL 370670, at *6 (Ohio Ct. App. Jul. 3, 1996).

Plaintiff argues that Defendants cannot satisfy § 1302.52(A) because the time for performance expired on December 27, 2021.  (Doc. No. 53 at PageID 992.)  The Purchase Order Modified form reflects a delivery date of December 27, 2021.  (Doc. No. 35-2 at PageID 381-83.) Therefore, it would have been impossible on January 13, 2021, for Defendants to cure "within the contract time," as required by § 1302.52(A).  Moreover, Defendants have offered no admissible evidence that it seasonably notified Plaintiff of its desire to have further reasonable time to substitute a conforming tender or that it could have submitted such tender.  (*See* Doc. No. 52 at PageID 987-89.)  In sum, Defendants do not show that they exercised their right to cure under the statute.

### iv.  **Substantial Performance**

Finally, Defendants argue that under common law breach of contract principles, it substantially performed its end of the contract because Plaintiff ordered 300,000 masks and

Defendants delivered 300,000 masks. (Doc. No. 36 at PageID 489-90.) In response, Plaintiff argues that Defendants did not substantially perform because they did not provide masks that have been certified by the National Institute for Occupational Safety & Health ("NIOSH") and Plaintiff can only use NIOSH-certified masks. (Doc. No. 40 at PageID 759.) Plaintiff further argues that, "[t]he doctrine of substantital performance is irrelevant to [Plaintiff]'s claim for breach of contract because, under Ohio law, the Uniform Commercial Code governs the sale of goods. . . ." (Doc. No. 40 at PageID 755.) Defendants simply argues that the doctrine of substantial performance applies, "under Ohio law." (Doc. No. 36 at PageID 489.)

The Northern District of Ohio recently addressed the issue of whether the doctrine of substantial performance applies in Ohio to UCC contracts, in *Lorad, LLC v. Azteca Milling, L.P.*, No. 1:20-cv-00357, 2023 U.S. Dist. LEXIS 70406, at *50-5, 2023 WL 3043607, at *20-2 (N.D. Ohio Apr. 21, 2023). In *Lorad*, the court conducted a thorough analysis of Ohio law and found that there was a "dearth of case law squarely addressing the issue." *Id*. at *20. The court further found that state courts outside of Ohio were split on the issue of whether substantial performance applied to UCC contracts. *Id*. at *21. The *Lorad* court assumed *arguendo* that the doctrine applied and that the undisputed facts demonstrated that the breaching party had not substantially performed. *Id*. This Court will similarly assume *arguendo* that the substantial performance doctrine applies to UCC contracts in Ohio.

"[A] party does not breach a contract when such party has substantially performed the terms of the contract, and mere nominal, trifling or technical departures are not sufficient to constitute breach." *Hansel v. Create Concrete & Masonry Constr. Co.*, 2002-Ohio-198, ¶ 12, 148 Ohio App. 3d 53, 56, 772 N.E.2d 138, 141 (Ohio Ct. App. 2002) (citing *Burlington Res. Oil & Gas Co. v. Cox*, 133 Ohio App.3d 543, 548, 729 N.E.2d 398, 402 (Ohio Ct. App. 1999)).

Moreover, "[f]or the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract. *Hansel*, 2002-Ohio-198 at ¶ 12 (citing *F.C. Machine Tool & Design, Inc. v. Custom Design Tech., Inc.*, No. 2001CA00019, 2001 WL 1673702, at *3 (Ohio Ct. App. Dec. 27, 2001)).

Defendants argue that Plaintiff ordered 300,000 masks and they delivered 300,000 masks. (Doc. No. 36 at PageID 489-90.) Plaintiff responds that this misses a material aspect of the contract: the masks must be NIOSH-certified. (Doc. No. 40 at PageID 759.) Defendants argue that Plaintiff has no admissible testimony to this point because it has tendered no witness who can testify that the masks were not NIOSH compliant or what the applicable federal regulations are for the hospital's masks. (Doc. No. 44 at PageID 885-88.)

As an initial matter, the interpretation of the applicability of federal regulations is not a matter for expert testimony or a question of fact for resolution by a jury. *Nemir v. Mitsubishi Motors Corp.*, No. 96-75380, 2006 U.S. Dist. LEXIS 8399, at *3, 2006 WL 322476, at *1 (S.D. Mich. Feb. 10, 2006); *CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 656 (E.D. Mich. 2000); *Cummins v. BIC USA. Inc.*, No. 1:08-CV-00019, 2011 U.S. Dist. LEXIS 72194, at *6, 2011 WL 2633959, at *2 (W.D. Ky. Jul. 5, 2011); *U.S. ex rel. Howard v. Lockheed Martin, Corp.*, No. 1:99-cv-285, 2014 U.S. Dist. LEXIS 39408, at *22, 2014 WL 1233081, at *8 (S.D. Ohio Mar. 25, 2014); *Eiserman v. Kentucky Fuel Corp.*, No. 5:14-444-DCR, 2016 U.S. Dist. LEXIS 57017, at *10, 2016 WL 1732728, at *3 (E.D. Ky. Apr. 29, 2016). The Court will resolve questions of law.

Under 29 C.F.R. § 1910.134(a):

(1) In the control of those occupational diseases caused by breathing air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors, the primary objective shall be to prevent atmospheric contamination . . .

When effective engineering controls are not feasible, or while they are being instituted, appropriate respirators shall be used pursuant to this section.

(2) A respirator shall be provided to each employee when such equipment is necessary to protect the health of such employee. The employer shall provide the respirators which are applicable and suitable for the purpose intended. The employer shall be responsible for the establishment and maintenance of a respiratory protection program . . . The program shall cover each employee required by this section to use a respirator.

The Center for Disease Control and Prevention ("CDC") has additionally stated that § 1910.134 applies to hospitals. (*See* Hospital Respiratory Protection Program Tool Kit, https://www.cdc.gov/niosh/docs/2015-117/pdfs/2015-117revised042022.pdf?id=10.26616/NIOSHPUB2015117 (last visited June 5, 2023).)

The regulation further provides that, "[t]he employer shall select a NIOSH–certified respirator." 29 C.F.R. § 1910.134(d)(1)(ii). There are several pieces of information printed on the mask itself that indicate whether they have been NIOSH-certified. This includes information such as the name or logo of the approval holder (such as 3M), a model or part number, a TC-Approval number, and a lot number. (*See "How to tell if your N95 Respirator is NIOSH Approved"*, https://www.cdc.gov/niosh/docs/2021-124/pdfs/2021-124.pdf (last accessed on June 5, 2023).)

On April 3, 2020, the Occupational Safety and Health Administration ("OSHA") provided interim guidance in light of the "supply shortages of disposable N95 filtering facepiece respirators." (*See* Occupational Safety and Health Administration, https://www.osha.gov/laws-regs/standardinterpretations/2020-04-03 (last accessed June 5, 2023).) In regard to respirators, the guidance provides:

If respiratory protection must be used, employers may consider use of alternative classes of respirators that provide equal or greater protection compared to an N95 FFR, such as NIOSH-approved, non-disposable, elastomeric respirators or powered, air-purifying respirators (PAPRs). Other filtering facepiece respirators, such as N99, N100, R95, R99, R100, P95, P99, and P100, are also permissible alternatives for those who are unable to obtain N95 FFRs. However, per 29 CFR § 1910.134(d)(1)(ii), when considering N95 alternatives, check to ensure that they

15

> are NIOSH-approved . . . When these alternatives are not available, or where their use creates additional safety or health hazards, employers may consider the extended use or reuse of N95 FFRs or use of N95 FFRs that were NIOSH-approved but have since passed the manufacturer's recommended shelf life.

*Id.* Notably, the guidance only provides for the use of NIOSH-approved masks that are not N95, the extended use or reuse of N95s, or the use of expired N95s.

It is clear from the regulation and interim guidance that Plaintiff could only use NIOSH-certified masks. Indeed, the record demonstrates that Snyder was aware from the previous transaction with Plaintiff that it needed NIOSH-certified masks. (Doc. No. 35-2 at PageID 356-57.)

Moreover, 3M's COVID-19 Fraud Response Team concluded that the masks provided by Defendants were not produced or sold by 3M. (Doc. No. 33 at PageID 296.) Specifically, Jacobsen stated that "the Mask packaging did not conform to authentic 3M packaging, and the construction of the Masks did not conform to the known characteristics of authentic 3M respirators." (*Id.*)

Defendants argue that Plaintiff cannot prove that the delivered masks that were delivered were not substantially similar to the masks ordered. However, this argument misses the point. Plaintiff was required by regulation to use NIOSH-certified masks. The masks provided by Defendants carried 3M markings and other indicia used to identify NIOSH-certified masks. (Doc. Nos. 33-2 at PageID 304; 35-2 at PageID 448.) 3M determined that it did not produce or sell the masks. (Doc. No. 33 at PageID 296.) Thus, without the CDC-recognized authentication for NIOSH-certified masks, it would be impossible for the masks to conform to necessary regulations. It is irrelevant whether the masks perform to the same level as an NIOSH-certified N95 mask because the NIOSH-certification is the key element of their usability to Plaintiff. [1]

---

[1] Defendants argue that determining whether the delivered masks were substantially similar to the ordered masks would be testimony that lay within the province of an expert witness. (Doc. No. 36 at PageID 491.) As explained above, whether the masks perform at a similar level is irrelevant to resolving this issue. Therefore, the Court will not

The Court finds that, even if the doctrine of substantial performance applies to UCC contracts in Ohio, Defendants failed to substantially perform under the contract. Moreover, the Court finds that Defendants breached the contract without legal excuse.

### v. **Damages**

The final element of a breach of contract claim is that the non-breaching party was damaged as a result. *List Indus., Inc.*, , 2021 U.S. Dist. LEXIS 128716, 2021 WL 2916967, at *14 (citing *Lawrence*, 127 Ohio App. 3d at 548-49). The evidence shows that Plaintiff performed its end of the contract by wiring Defendants $1,185,000 for the 3M N95 masks. The evidence further shows that the masks did not conform to the contract and, consequently, Defendants breached the contract without excuse. Consequently, Plaintiff was damaged by not receiving its end of the bargained for exchange.

Therefore, the Court enters judgment in favor of Plaintiff Kettering Adventist Healthcare on liability only on Count I, Breach of Contract. The Court will defer on deciding the question damages at this time, however.

### B. **Fraud**

Count II of Plaintiff's Complaint alleges a claim of Fraud and Fraud in the Inducment. (Doc. No. 1 at PageID 14-16.)

Defendants argue that Plaintiff's fraud claim should be dismissed because it is based on the same actions that form the basis of the breach of contract claim. (Doc. No. 36 at PageID 486-88.) In opposition to Defendants' Motion, Plaintiff argues that its fraud claim is an alternative

---

address the need for expert testimony on that point.

claim in the event the Court finds no contract exists. (Doc. No. 40 at PageID 766-67.) While Plaintiff did move for summary judgment on its fraud claim, it failed to address the claim in its reply in support of its motion. (*See* Doc. No. 45.)

Ohio courts have consistently recognized that, "[i]n Ohio, a breach of contract does not create a tort claim," and that "'the existence of a contract action. . . excludes the opportunity to present the same case as a tort claim.'" *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 151, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) (quoting *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981)); *Dayton Children's Hosp. v. Garrett Day, LLC*, 2019-Ohio-4875, ¶ 106, 149 N.E.3d 1004, 1031 (Ohio Ct. App. 2019). Moreover, "[a] tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron*, Ohio App.3d at 151 (citing *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 117 (6th Cir. 1976)).

In this case, Plaintiff acknowledges that its fraud claim is plead as an alternative claim that should only survive "[i]n the event the Court finds that no binding contract exists between the parties." (Doc. No. 40 at PageID 766-67.) A binding contract exists in this case. (*See* Section III.A.) Moreover, Plaintiff's allegation that Defendants claimed they could provide 3M N95 masks and they failed to exercise reasonable diligence in authenticating the masks they were selling to Plaintiff, are both part of the same conduct forming the breach of contract. Therefore, Plaintiff's claim of fraud contained in Count II is dismissed.

## C. **Fraud in the Inducement**

Plaintiff also moves for summary judgment on its claim of fraud in the inducement, which is also contained in Count II of Plaintiff's Complaint. (Doc. No. 1 at PageID 14-16.) While Defendants do not explicitly reference Plaintiff's fraud in the inducement claim, they do make several arguments related to fraud that apply equally to this claim.

A claim of fraud in the inducement arises in circumstances where "a party is induced to enter into an agreement through fraud or misrepresentation, '[t]he fraud relates not to the nature or purport of the [contract], but to the facts inducing its execution. . . .'" *Abm Farms v. Woods*, 81 Ohio St. 3d 498, 502, 692 N.E.2d 574, 578 (Ohio 1998) (quoting *Haller v. Borror Corp.*, 50 Ohio St. 3d 10, 14, 552 N.E.2d 207, 210 (Ohio 1990)). The elements of fraud in the inducement are:

> (1) a representation or, when there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance on the representation or concealment, and (6) an injury proximately cause by that reliance.

*Superior Care Pharm., Inc. v. Med. Shoppe Int'l, Inc.*, No. 2:10-cv-207, 2011 U.S. Dist. LEXIS 13013, at 22-23, 2011 WL 597065, at *8 (S.D. Ohio Feb. 10, 2011) (citing *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868 (Ohio 1998)).

"Fraud in the inducement can 'generally' be maintained simultaneously with a breach of contract claim because the duty not to breach a contract is 'separate and independent' from the duty not to deceive a party entering into an agreement or contract." *Burrows v. Fuyao Glass Am. Inc.*, No. 3:17-cv-186, 2017 U.S. Dist. LEXIS 202216, at *10-11, 2017 WL 6262189, at *4 (S.D. Ohio Dec. 8, 2017) (citing *Stalvey v. NVR, Inc.*, No. 1:10-cv-1729, 2012 U.S. Dist. LEXIS 2506, at *17, 2012 WL 78159, at *6 (S.D. Ohio Jan. 9, 2012)); *King v. Hertz Corp.*, 1:09-cv-2674, 2011 U.S. Dist. LEXIS 35610, at *8, 2011 WL 1297266, at *3 (N.D. Ohio. Mar. 31, 2011).

19

In this instance, Snyder represented to Plaintiff in her August 26, 2020 email that, "[o]ur corporate office has been able to acquire the 3M 1860's so if the need arises in the future, please let me know." (Doc. No. 35-2 at PageID 426.) Moreover, during the March 2020 discussions, Snyder understood that Plaintiff's main request was for 3M N95 masks. (*Id*. at PageID 359.) Snyder further testified that she did not have any processes or procedures in place to verify the authenticity of the masks. (*Id*. at PageID 372.) Instead, Snyder relied on DeMeo, a fellow franchisee who had been working in the PPE space, to help procure the masks for Plaintiff's December 2020 order. (*Id*. at PageID 370.) Snyder further testified that she did not believe that DeMeo was an authorized 3M distributor. (*Id*. at PageID 374.)

Plaintiff has satisfied the first two elements of the fraud in the inducement test, but fails at the third step. It is not clear that Snyder's statements were "made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred," or "with the intent of misleading another into relying upon it." *Superior Care Pharm.*, 2011 U.S. Dist. LEXIS 13013, at 22-23, 2011 WL 597065, at *8 (citing *Williams*, 83 Ohio St.3d at 475). While Snyder's deposition testimony states that she does not believe DeMeo was an authorized 3M dealer, that is not the same as knowing that he did not have access to authenticate 3M masks. Further, there is no evidence presently before the Court that Snyder knew her August 26, 2020 statement that "[o]ur corporate office has been able to acquire the 3M 1860's," was false or made with the intent to mislead Plaintiff.

Therefore, genuine issues of fact exist as to whether Defendants fraudulently induced Plaintiff into the December 10, 2020 contract for the sale of masks. Plaintiff and Defendants' motions are denied as to the fraud in the inducement claim contained in Count II.

20

### D. **Negligent Misrepresentation**

Plaintiff alleges a claim of negligent misrepresentation in Count III of the Complaint. (Doc. No. 1 at PageID 16-17.)

Defendants argue that Plaintiff's negligent misrepresentation claim must be dismissed because it is based on the same conduct that constitutes its breach of contract action.  (Doc. No. 36 at PageID 487.)  Plaintiff responds that its negligent misrepresentation claim is plead in the alternative and that the Court should not dismiss the claims in the event it finds that a binding contract does not exist.  (Doc. No. 40 at PageID 766-67.)  Additionally, in Plaintiff's Motion, it argues that the elements of negligent misrepresentation have been met because Defendants falsely claimed they could provide 3M N95 masks and they failed to exercise reasonable diligence in authenticating the masks they were selling to Plaintiff.  (Doc. No. 35 at PageID 330-31.)

The elements of negligent misrepresentation are:

(1) one who, in the course of his or her business, profession, or employment, or in any other transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; and (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.

*Martin v. Ohio State Univ. Found.*, 139 Ohio App. 3d 89, 103, 742 N.E.2d 1198, 1209 (Ohio Ct. App. 2000) (citing *Delman v. Cleveland Hts.*, 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 837–838 (Ohio 1989)).

In this case, Plaintiff states in its opposition to Defendants' Motion that its negligent misrepresentation claim is plead as an alternative claim that should survive, "[i]n the event the Court finds that no binding contract exists between the parties."  (Doc. No. 40 at PageID 766.) Yet, in Plaintiff's reply in support of its own Motion, it argues that the negligent misrepresentation claim can co-exist with the breach of contract claim and that the claim is alleged against Snyder

individually. (Doc. No. 45 at PageID 913-14.) This is conduct of the type Plaintiff complained of in its Motion for Leave to File Sur-Reply. (*See* Doc. No. 47 at PageID 958.) It cannot be said that this was an argument made in response to Defendants' opposition, when Plaintiff made a contradictory argument in a separate filing before this Court. Such tactics will not be rewarded and the Court will not consider the arguments directed to negligent misrepresentation made by Plaintiff in its reply brief.

The Court has held that a binding contract exists in this case. (*See* Section III.A.) Moreover, Plaintiff's argument that Defendants claimed they could provide 3M N95 masks, but failed to exercise reasonable diligence in authenticating the masks they were selling to Plaintiff, are both part of the same conduct forming the breach of contract. Therefore, Plaintiff's claim for negligent misrepresentation contained in Count III is dismissed.

### E. Conversion and Replevin

Count IV and Count V of Plaintiff's Complaint allege claims of conversion and replevin. (Doc. No. 1 at PageID 17-18.)

Conversion is an exercise of dominion or control wrongfully exerted over property in denial of, or under a claim inconsistent with, the rights of another. *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (Ohio 1990). Typically, "'[t]he elements of a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" *Dice v. White Family Cos.*, 173 Ohio App. 3d 472, 477, 878 N.E.2d 1105, 1109 (Ohio Ct. App. 2007) (quoting *Haul Transport of VA, Inc. v. Morgan*, No. 14859, 1995 Ohio App. LEXIS 2240, at *9, 1995 WL 328995, at *3 (Ohio Ct. App. Jun. 2, 1995)). However, Ohio courts have consistently held that "[a] litigant may not recover for both a breach of contract

22

and conversion." *Patel v. Strategic Group, LLC*, 2020-Ohio-4990, ¶ 42, 161 N.E.2d 42, 52 (Ohio Ct. App. 2020) (citing *Boston v. Sealmaster Indus.*, 2004-Ohio-4278, ¶ 37 (Ohio Ct. App. 2004)); *Bold Home Prods. v. Carbonklean, LLC*, No. 2:20-cv-4020, 2023 U.S. Dist. LEXIS 5975, at *42, 2023 WL 155901, at *14 (S.D. Ohio Jan. 11, 2023). Moreover, replevin "'is solely a prejudgment remedy.'" *Gates v. Praul*, 2011-Ohio-6230, ¶ 46 (Ohio Ct. App. 2011) (quoting *Am. Rents v. Crawley*, 77 Ohio App. 3d 801, 803-04, 603 N.E.2d 1079, 1080 (Ohio Ct. App. 1991)). "'When property has not been seized. . . the action in essence converts from one in replevin to one in conversion and only damages are awardable.'" *Gates*, 2011-Ohio-6230 at ¶ 46 (quoting *Am. Rents*, 77 Ohio App. at 803-04, 603 N.E.2d at 1080).

As the Court has entered judgment in favor of Plaintiff on the breach of contract claim and any damages would be identical between that claim and the conversion and replevin claims, Count IV, conversion, and Count V, replevin, are dismissed.

### F. Unjust Enrichment

The final claim alleged in Plaintiff's Complaint is for unjust enrichment in Count VI. (Doc. No. 1 at PageID 18-19.)

Defendants argue that Plaintiff's unjust enrichment claim must be dismissed because Plaintiff has stated a claim for breach of contract and a valid contract exists covering this transaction. (Doc. No. 36 at PageID 485-86.) Plaintiff states that this claim is plead in the alternative and that the Court should not dismiss the claim in the event it finds that a binding contract does not exist. (Doc. No. 40 at PageID 766-67.)

"Generally, Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject matter." *Bunta v. Superior VacuPress, LLC*, 2022-Ohio-4363, ¶ 36 (Ohio 2022) (citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d

393 (Ohio 1954)). Accordingly, Plaintiff cannot succeed on its claim for unjust enrichment as a matter of law because the parties entered into a contract for the sale of the masks. *See Williams v. NAACP*, 2019-Ohio-1897, ¶ 24, 135 N.E.3d 1260, 1268 (Ohio Ct. App. 2019) (holding that unjust enrichment claim was properly dismissed where an express contract existed between the parties); *Evon v. Waters*, 2021-Ohio-3475, 11 (Ohio Ct. App. 2021) ("Evon cannot succeed on her claim of unjust enrichment as a matter of law because the parties entered into a contract for the sale and purchase of the property").

Therefore, the Court finds that, as a contract exists between the Parties (*See* Section III.A.), Plaintiff's claim for unjust enrichment contained in Count VI is dismissed.

## IV.  CONCLUSION

For the reasons stated above, the Court **ORDERS** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 35) is **GRANTED, IN PART**, and **DENIED, IN PART**, and Defendants' Motion for Summary Judgment (Doc. No. 36) is **GRANTED, IN PART,** and **DENIED, IN PART,** such that:

   a. The Court enters judgment in favor of Plaintiff Kettering Adventist Healthcare on liability only on Count I, Breach of Contract;

      i. The Court defers judgment on damages to a later time;

   b. Plaintiff's Count II, Fraud and Fraud in the Inducement, is **DISMISSED** to the extent it alleges a claim for fraud;

   c. Plaintiff's Count III, Negligent Misrepresentation, is **DISMISSED**;

   d. Plaintiff's Count IV, Conversion, is **DISMISSED**;

   e. Plaintiff's Count V, Replevin, is **DISMISSED**;

   f. Plaintiff's Count VI, Unjust Enrichment, is **DISMISSED**;

2. The Court finds that genuine issues of material fact exist as to Plaintiff's Count II, Fraud and Fraud in the Inducement, to the extent it alleges a claim for Fraud in the Inducement.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, June 13, 2023.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE